**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

SANDRA IRENE B.,[1]

                                Plaintiff,                    6:18-cv-00038 (BKS)

v.

NANCY A. BERRYHILL, Acting Commissioner of Social
Security,

                                Defendant.
_____

**Appearances:**

_For Plaintiff:_
Howard D. Olinsky
Olinsky Law Group
One Park Place
300 South State Street
Syracuse, NY 13202

_For Defendant:_
Ariella Zoltan
Special Assistant U.S. Attorney
Attorney for Defendant
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

       Plaintiff Sandra B. filed this action under 42 U.S.C. § 405(g) seeking review of the

Acting Commissioner of Social Security's denial of her application for Social Security Disability

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

Insurance Benefits and Supplemental Security Income. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 13, 16). After carefully reviewing the Administrative Record,[2] (Dkt. No. 10), and considering the parties' arguments, the Court affirms the Commissioner's decision.

## II.     BACKGROUND

### A.     Procedural History

On September 29, 2011, Plaintiff filed an application for disability benefits, (R. 64), claiming that she had been disabled since June 1, 2008 due to an on-the-job back injury and depression, (R. 166–70). The Commissioner denied her claim on February 9, 2012. (R. 64, 80). Plaintiff requested review of that denial, (R. 15–16), and a hearing was held before Administrative Law Judge ("ALJ") Gregory M. Hamel on April 17, 2013, (R. 37–63). On June 17, 2013, the ALJ issued a decision finding that Plaintiff was "not disabled" within the meaning of the Social Security Act. (R. 656–58). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 674–76). Plaintiff sought review of that determination from this Court under 42 U.S.C. § 405(g). (R. 684). On December 23, 2016, the Court found in favor of Plaintiff, finding that, in "the absence of a functional assessment from Plaintiff's treating physicians or the opinion of a consultative examiner that would support the ALJ's RFC determination, remand for further development of the record" was required. *See Sandra B. v. Colvin*, No. 15-cv-00324 (N.D.N.Y. Dec. 23, 2018), ECF No. 23, at 30. Accordingly, the Court reversed the Commissioner's denial, and remanded for further proceedings at the administrative level. *Id.*

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 10), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

Following this Court's order, the Appeals Council vacated the final decision of the Commissioner and remanded Plaintiff's claim to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record[,] and issue a new decision."[3] (R. 764). On September 5, 2017, a second hearing was held before ALJ Bruce S. Fein. (R. 627–55). On November 9, 2017, ALJ Fein issued a decision again finding that Plaintiff was "not disabled" within the meaning of the Social Security Act. (R. 614). Plaintiff did not file written exceptions with the Appeals Council, and the Appeals Council did not assume jurisdiction on its own within sixty days of the ALJ's decision, rendering the ALJ's denial the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d). Plaintiff commenced this action on January 10, 2018. (Dkt. No. 1).[4]

## B. Plaintiff's 2013 Hearing Testimony

Plaintiff was forty-two years old on the date of her April 17, 2013 hearing. (R. 768). She testified that she was a high school graduate, (R. 40), and that she had last worked as a quality control inspector in a manufacturing facility, (R. 41). She left her job in June 2008, after "[her] knee blew out and [her] back at the same time." (R. 41–42). Plaintiff stated that she had back surgery in November 2008 and that, although she tried to find another job, no one would hire her because of her back problems. (R. 42). At the time of her hearing, Plaintiff was enrolled at

---

[3] The record indicates that, prior to the Court's order remanding her claim, Plaintiff filed additional Supplemental Security Income and Disability Insurance Benefits claims on February 2, 2015 and September 15, 2016, respectively. (R. 708, 742). The Appeals Council's order of remand "render[ed] the subsequent claims duplicate" and indicated that the ALJ would "consolidate the claim files . . . and issue a new decision on the consolidated claims." (R. 764).

[4] "An ALJ making a decision in a case on remand from the Appeals Council . . . is to consider the case *de novo* when the Appeals Council has vacated the ALJ's previous decision." *Uffre v. Astrue*, No. 06-cv-7755, 2008 WL 1792436, at *7, 2008 U.S. Dist. LEXIS 32080, at *20 (S.D.N.Y. Apr. 18, 2008) (citing Social Security Administration, Office of Disability Adjudication and Review, Hearings, Appeals, and Litigation Law Manual, I-2-8-18(A) ("When the AC vacates an ALJ decision . . . the AC will usually direct that the ALJ offer the claimant an opportunity for a new hearing and issue a new decision in the case.")). Accordingly, the Court recites the entirety of Plaintiff's relevant medical history, as considered by ALJ Fein on remand.

Mohawk Valley Community College, attending classes five days a week towards an associate degree in data processing. (R. 39, 43).

Plaintiff testified that she lived with her boyfriend. (R. 40). She stated that she would try to "pick up" around the house, but that it "depend[ed] on how [her] back" was feeling. (R. 44). She and her boyfriend did the laundry together. (R. 44). She sometimes cooked meals, but "it all depend[ed] on if [she] can stand at the stove." (R. 44). Plaintiff testified that her boyfriend usually did the grocery shopping, but that she could sometimes do it depending on how her back was feeling. (R. 47). She stated that she had not had a driver's license since 2010 because driving hurt her back. (R. 45–46). She took the city bus to get to school and sometimes got rides from a friend. (R. 46). When she was not at school or doing homework, she would watch television, read, or play computer games. (R. 43, 55). She testified that she went to a friend's house "once in a great while" to socialize, and that she had recently gone there for dinner. (R. 47). She met friends to talk, "go out for coffee, and stuff like that." (R. 47).

Plaintiff testified that, at the time of the hearing, she was in pain "mostly every day." (R. 51). She described the pain as "about a seven or eight [out of ten] all the time." (R. 55). Occasionally, she would be "down for a week" because of her back. (R. 51). During a recent flare-up, she had difficulty moving and needed help to get out of bed and to the hospital. (R. 54). She had a "hard time sitting" and could not sit for more than "20 minutes to a half hour" without getting up and "mov[ing] around or stand[ing] for awhile." (R. 51). She had a hard time putting on her socks and shoes. (R. 51). She received special accommodations at school, including the use of a "big, soft chair," and was allowed to stand up in the classroom if necessary. (R. 52). She indicated that she had to change position every ten minutes while in class, and that her pain sometimes interfered with her ability to concentrate on her schoolwork. (R. 56).

Plaintiff testified that her doctors prescribed hydrocodone for her back pain, and that she also took also took ibuprofen and aspirin. (R. 47, 49). Plaintiff was prescribed Zoloft and Remeron, which she indicated were helpful for alleviating her depression. (R. 49, 51).

### C.     Plaintiff's 2017 Hearing Testimony

Plaintiff was 47 years old on the date of her September 5, 2017 hearing before ALJ Fein. She testified that, since the time of her last hearing, she had undergone a right hip replacement in December 2015. (R. 630). In August 2016, she had back surgery "because a disc popped out above [her] pins and rods that [she] had in previously." (R. 630). Before her back surgery, she took prescribed pain medication and received shots, which were ineffective. (R. 631). In December 2016, she developed bursitis in her right hip, which she described as "real bad arthritis" that was "only going to get worse." (R. 631).

Plaintiff testified that her pain was "moderate" after her hip surgery and became worse after her back surgery. (R. 635). She testified that her back surgery relieved her pain for "a couple months," after which it felt "like somebody [was] taking their fist and just grinding [her] back." (R. 631). At the time of her second hearing, she frequently experienced a "little bit" of pain in her right hip, radiating down into her legs and feet. (R. 632). As a result of her hip and back pain, Plaintiff was unable to get out of bed or walk on certain days, (R. 631), and could only sit for ten minutes at a time before she would have to change positions, (R. 633). Plaintiff testified that she could only stand for approximately fifteen minutes at a time before her legs would become numb, (R. 634), after which she would have to "walk around for a little bit until [her] back [got] to where it [wouldn't] bother [her] so much," (R. 634), or lie down, (R. 636). Plaintiff testified that she was prescribed Meloxicam for her hip pain, (R. 632), and that she took Gabapentin for her back "when the pain [was] really, really bad." (R. 640). Although Gabapentin relieved the pain, enabling her to "get up and do a little bit," she did not take it every day because

it made her sleep. (R. 641). She further indicated that, approximately three or four days per week, she would spend between twenty and twenty-three hours a day lying down watching television and sleeping. (R. 640, 641).

Plaintiff stated that, at the time of her second hearing, she used a cane to stand and walk because her hip and back pain caused difficulty balancing. (R. 636–37). Plaintiff testified that the cane was not prescribed by a doctor and that she could walk without it, (R. 637), but that, even using a cane, she would have to stop every ten minutes due to back pain, (R. 639). She could not lift more than ten pounds because of lower back pain, (R. 637), and attempting to lift more "could put [her] back out." (R. 638). She testified that she could not do laundry or use a mop. (R. 638). She could not do yard work. (R. 642). She could not go up or down stairs without "upsetting [her] back." (R. 638). Although she was able to use a broom, she could not use a dustpan because she could not bend down due to pain. (R. 638). Plaintiff testified that, if she bent down, she could "not get back up without some help." (R. 638). As a result, she had difficulty putting socks on and could not tie her shoes. (R. 643). She testified that she did not have difficulty bathing or getting dressed. (R. 643). Plaintiff was able to drive but did so infrequently because it was difficult to turn around to drive in reverse. (R. 642). On days when she experienced less pain, she was able to "stand up long enough to make something for dinner." (R. 642).

Plaintiff testified that she began experiencing depression in 2011, when her "mother passed away and [Plaintiff] didn't know how to deal with it" and "wanted to kill [herself] twice." (R. 643). At the time of her second hearing, Plaintiff was attending counseling once a month and seeing a psychiatrist once every three months "for [her] meds." (R. 643). Plaintiff indicated that she was taking Zoloft and Remeron, which made her "stable," but that she still became depressed

approximately once each month for "about [a] couple days." (R. 643–44). Plaintiff was also diagnosed with anxiety, which caused her to become nervous around unfamiliar people. (R. 645). Plaintiff testified that she did not have difficulty concentrating or focusing. (R. 645).

### D.     Expert's Hearing Testimony

Vocational Expert ("VE") Joseph Atkinson also testified at the September 5, 2017 hearing before ALJ Fein. (R. 646). He noted that Plaintiff previously worked as an "inspector/packager," which qualified as "medium work," and as an "inspector," which was "light work in the general economy, [but] medium as performed." (R. 648). The ALJ posed several hypothetical questions regarding employment opportunities available to "a person of [Plaintiff's] age, education[,] and work experience" with varying degrees of physical and mental limitations. (R. 649).

First, the VE testified that a person of Plaintiff's age, education, and work experience— who could "perform at the light exertional level and [could] perform all postural limitations on an occasional basis except that they should not climb ropes, ladders[,] or scaffolds"—would be able to "perform [Plaintiff's] past work as it was actually performed or as it is customarily performed per" the Dictionary of Occupational Titles ("DOT").[5] (R. 649).

Second, the VE testified that a person of Plaintiff's age, education, and work experience—who could "perform at the sedentary level" and could "perform all postural limitations on an occasional basis, except that they should not climb ladders, ropes[,] or scaffolds"—would not be able to perform Plaintiff's past work as it was actually performed or customarily performed. (R. 649). The VE further testified, however, that a person with such

---

[5] *See* 20 C.F.R. §§ 404.1566(d) and 416.966(d) (stating that the Commissioner will take administrative notice of "reliable job information" available from various publications, including the *Dictionary of Occupational Titles*).

"vocational functions and limitations" could perform sedentary work in the national or regional economy as an "order clerk, food and beverage," a "charge-account clerk," or a "document preparer." (R. 650).

Third, the VE testified that a person of Plaintiff's age, education, and work experience—who could perform at the light exertional level and could "climb ramps or stairs occasionally, kneel and crouch occasionally, but should not climb ropes, ladders or scaffolds[,] or crawl, should avoid all exposure to unprotected heights and . . . should work in a low-stress job defined as having only occasional decision making being required, only occasional changes in work setting being required[,] and only occasional judgment being required on the job as well as only occasional interaction with [the] public, coworkers[,] and supervisors"—would not be able to perform Plaintiff's past work as it was actually performed or customarily performed. (R. 651). The VE further opined, however, that a person with such "vocational functions and limitations" could perform light work in the national or regional economy as an "office helper," "mail clerk," or "marker II." (R. 651).

Plaintiff's counsel then questioned the VE about the employment opportunities available to a hypothetical individual of Plaintiff's age, education, and work experience who had certain additional limitations—beyond those described above—including: (i) the need "to perform a sit/stand option every 10 to 15 minutes and also required the use of a cane"; (ii) an inability to "satisfactorily perform . . . independently, appropriately, effectively[,] and on a sustained basis in a regular work setting"; (iii) the need to be "off task at least 20% of the workday due to a combination of her condition[s]"; (iv) the need to "miss at least four days per [month] due to a combination of her conditions"; and (v) the need to "sit less than two hours" per day, stand or walk "less than two hours" per day, the use of a cane, the inability to stoop, bend, crouch, squat,

climb ladders, or lift more than ten pounds, (R. 652–53). The VE acknowledged that any of these additional restrictions, when paired with the physical limitations described in the ALJ's hypotheticals, would "preclude . . . any work in the general economy." (R. 652–53).

### E.     Plaintiff's Medical History

#### 1.     2008 Back Injury and Spinal Fusion Surgery

##### a.     Oneida Healthcare Center Emergency Department

Plaintiff went to the Oneida Healthcare Center Emergency Department on June 5, 2008 after injuring her left leg at work. (R. 256, 589). Plaintiff reported twisting her "left lower extremity at work several days ago with pain left hip and knee." (R. 256). The examining doctor found "minimal swelling" around her left knee and "[t]enderness left hip and knee" and noted that she had "[d]ifficulty ambulating." (R. 256–57). X-rays of Plaintiff's left knee and hip revealed no fractures.[6] (R. 257). Plaintiff received a diagnosis of "sprain left hip and knee" and was discharged with crutches and a prescription for Lortab.[7] (R. 258).

##### b.     Dr. Purnachandra Popuri, MD

Plaintiff went to see her primary care provider, Purnachandra Popuri, MD, on June 9, 2008. (R. 570). Plaintiff reported that she had "pain involving the left hip with radiation to the knee and foot." (R. 571). Dr. Popuri referred Plaintiff to an orthopedist and prescribed Naprosyn and Lortab. (R. 571).

Plaintiff saw Dr. Popuri four times between June 16, 2008 and August 15, 2008 "for follow up regarding pain in left knee side of left hip and lower back on the left side," as well as

---

[6] The radiological reports indicated "normal alignment and position of the bones of the knee" and no joint effusion or fractures. (R. 259–60). There was however, "moderate right hip arthritis." (R. 260).

[7] "Lortab contains a combination of acetaminophen and hydrocodone." https://www.drugs.com/lortab.html (last visited Mar. 14, 2019).

"numbness in the left foot." (R. 565–78). Dr. Popuri sent Plaintiff for an MRI[8] and prescribed physical therapy.[9] (R. 572). During her visit on August 15, 2008, Plaintiff complained of "significant pain in the left lower back" radiating down the left thigh and lower leg below the knee occasionally. (R. 565). Dr. Popuri noted that Plaintiff went to physical therapy for six weeks and found it helpful and that she is "off work at this time because of continued pain." (R. 565).

### c.     Dr. Richard Tallarico, MD

On September 9, 2008, Plaintiff saw Richard Tallarico, MD, an orthopedic surgeon. (R. 311). After reviewing Plaintiff's history and radiographic studies and conducting a physical examination, Dr. Tallarico concluded that Plaintiff had "a grade 2 isthmic spondylolisthesis at L4-5 with evidence of significant foraminal nerve root entrapment" and that it was "likely that she will come to require surgical intervention in the form of posterior lumbar decompression and instrumented fusion at the L4-5 level." (R. 311). When Plaintiff returned to see Dr. Tallarico on October 2, 2008, she advised that she would like to go forward with surgery. (R. 310). On November 17, 2008, Dr. Tallarico performed "L4-L5 decompression and fusion" surgery. (R. 262, 272–74). Plaintiff was hospitalized from November 17, 2008 to November 26, 2008. (R. 262).

### 2.     Treatment After Spinal Fusion

### a.     Dr. Richard Tallarico, MD, and Catherine Tomaiuoli, NP

Plaintiff saw Dr. Tallarico on December 16, 2008 and reported "her leg pain is completely gone" and "back pain is significantly improved." (R. 303). Dr. Tallarico examined

---

[8] Plaintiff had imaging on June 20, 2008 and July 7, 2008 (R. 558–59).

[9] Plaintiff attended physical therapy approximately 20 times from July 10, 2008 through October 6, 2008 in an effort to address her back pain. (R. 214–55).

Plaintiff and noted that she walked with "a non-antalgic gait,"[10] that her range of motion was "quite reasonable," and that she was "[n]eurologically motor and sensory intact to bilateral lower extremities." (R. 303). "X-ray examination shows well positioned hardware." (R. 303, 326). Dr. Tallarico noted that Plaintiff was "going to start physical therapy." (R. 303).[11]

Plaintiff returned to see Dr. Tallarico on February 2, 2009. (R. 302). Dr. Tallarico noted that Plaintiff "had been doing very well" with "[n]o complaints of back pain and leg pain," and found the incision "well healed" and Plaintiff's range of motion "good in the lower extremities." (R. 302). "X-ray examination revealed well-positioned hardware." (R. 302).

Plaintiff saw Dr. Tallarico on February 26, 2009 and complained of "mild occasional low back pain" and "some pain over her hips." (R. 301). Dr. Tallarico diagnosed bilateral trochanteric bursitis.[12] (R. 301).

Plaintiff saw Nurse Practitioner Catherine Tomaiuoli the same day (February 26, 2009). (R. 300). NP Tomaiuoli noted that Plaintiff had "bilateral greater trochanteric bursitis, whose current treatment with nonsteroidal anti-inflammatories has not been effective." (R. 300). NP Tomaiuoli injected Depo-Medrol[13] into Plaintiff's left and right "greater trochanteric bursal region." (R. 300).

Plaintiff returned to see NP Tomaiuoli on April 30, 2009 and reported "new onset of back pain . . . as well as upper buttock discomfort." (R. 295). NP Tomaiuoli found, on physical examination, that Plaintiff "walks with a full stride and normal and nonantalgic gait," that the

---

[10] "[A]ntalgic gait [is] a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase." http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited Mar. 14, 2019).

[11] Plaintiff began physical therapy on January 12, 2009. (R. 338).

[12] "Trochanteric bursitis is characterized by painful inflammation of the bursa located just superficial to the greater trochanter of the femur." http://emedicine.medscape.com/article/309286-overview (last visited Mar. 14, 2019).

[13] "Depo-Medrol suspension is a corticosteroid. It works by modifying the body's immune response and decreasing inflammation." https://www.drugs.com/cdi/depo-medrol-suspension.html (last visited Mar. 14, 2019).

"incision is well-healed," and that Plaintiff "has some tenderness to palpation noted in her lumbar spine paraspinals around the L3-4 region" and "some left piriformis tenderness to palpation." (R. 295). NP Tomaiuoli found "no greater trochanteric bursal irritation," "no SI joint irritation," "no sciatic irritation," motor strength testing was "5/5," and "sensation is intact." (R. 295). NP Tomaiuoli noted that imaging studies indicated "appropriate position of hardware." (R. 295, 324). NP Tomaiuoli noted that Plaintiff was "still considered temporarily totally disabled from her surgical intervention with a good prognosis for recovery." (R. 296).

On July 2, 2009, NP Tomaiuoli examined Plaintiff and noted that Plaintiff had "tenderness to her lower lumbar spine as well as along her bilateral paraspinal." (R. 293). NP Tomaiuoli found a "good range of motion with forward flexion," that Plaintiff was "able to lateral bend to the right," that her "motor strength is 5/5," and that she "walks with a full stride and normal and nonantalgic gait." (R. 293). NP Tomaiuoli further found that Plaintiff had "discomfort with the extremes of forward flexion and hyperextension" and "discomfort on her left side with lateral rotation to the left." (R. 293). NP Tomaiuoli noted that "imaging studies reveal appropriate position of hardware and interbody cage at L4-5 fusion." (R. 293, 323). NP Tomaiuoli advised Plaintiff to take naproxen twice a day and indicated that "she is still to remain out of work on her temporary, total disability." (R. 294).

On August 7, 2009, Plaintiff saw Dr. Tallarico and reported "severe back pain above the site of the incision." (R. 291). Dr. Tallarico observed that Plaintiff was "having a hard time standing upright," ordered an MRI, and prescribed a Medrol Dosepak.[14] (R. 291). Dr. Tallarico

---

[14] The generic name for a Medrol Dosepak is methylprednisolone, which "is a steroid that prevents the release of substances in the body that cause inflammation." https://www.drugs.com/mtm/medrol-dosepak.html (last visited Mar. 14, 2019).

indicated that Plaintiff's "work status will remain temporarily totally disabled from work until further evaluation." (R. 291).

On August 24, 2009, Plaintiff saw NP Tomaiuoli for "low back pain and left lower extremity pain." (R. 289). Plaintiff stated that "she has had exacerbation of her back discomfort" after having a motor vehicle accident.[15] (R. 289). On physical examination, NP Tomaiuoli found that Plaintiff "ambulates with a nonantalgic gait, standing with a mildly lateral flexed posture," and that "motor strength of her lower extremities is 5/5." (R. 289). NP Tomaiuoli noted that an MRI showed "appropriate position of hardware," "no change in her adjacent segment," "a mild disk bulge . . . with no nerve root compression." (R. 289).

### b. Dr. John Minor, DO

On November 5, 2009, Plaintiff saw Dr. John Minor, DO, at the Spine & Pain Clinic. (R. 366). Plaintiff reported that although her left leg and low back pain improved somewhat after the November 2008 surgery, the improvement "lasted about 4-5 months and then spontaneously the same quality and distribution of symptoms returned to the left leg though less intense than prior to surgery." (R. 366). Plaintiff indicated that "[h]er low back pain stayed about the same as after surgery." (R. 366). Plaintiff reported that she had engaged in "a course of outpatient physical therapy and participated in a work hardening program and was felt to have plateaued" and that "[t]owards the end of this she developed increased low back pain and increased left lower extremity pain." (R. 366). On physical examination, Dr. Minor found that Plaintiff exhibited "no depression, anxiety or agitation," and that she "ambulates with an antalgic gait." (R. 368). Dr. Minor noted tenderness at L5-S1 and L4-5, no trochanteric tenderness, 5/5 muscle

---

[15] Plaintiff was in a motor vehicle accident on August 19, 2009 and treated in the emergency department, where she was given morphine and Lortab. (R. 268, 270, 333–37). Plaintiff was discharged following a lumbar spine MRI, which suggested "residual disk protrusion at L4-L5 causing left neural foraminal narrowing" and chest, pelvic, and C-spine x-rays, which showed "no acute disease." (R. 270, 320).

strength, normal sensation, and negative straight leg raise. (R. 368–69). Dr. Minor also noted "tenderness over the lower lumbar paraspinal region as well as overlying the left mid gluteal region." (R. 369). Dr. Minor reviewed Plaintiff's radiological images and diagnosed "postlaminectomy syndrome lumbar region" and "radiculitis–thoracic/lumbar." (R. 369). Dr. Minor prescribed Mobic, Lyrica, Skelaxin, and Tramadol, and advised Plaintiff to "maintain physical activity" and apply heat to her low back as needed. (R. 370).

Plaintiff returned to see Dr. Minor on December 17, 2009. (R. 593). Dr. Minor's findings on physical examination were similar to his previous findings. (R. 595).

Plaintiff saw Dr. Minor on January 20, 2010. (R. 378). Plaintiff reported that her numbness and tingling had improved, pain average was 6–7, and she "is benefitting from her medications." (R. 378). On examination, Dr. Minor found no depression, anxiety, or agitation, "no excessive pain behavior," tenderness in L5-S1 and L4-5, 40-degree flexion, 20-degree extension, 5/5 muscle strength, normal sensation, and negative straight leg raise. (R. 379–80). Plaintiff indicated that she wanted "to hold off on caudal epidural steroid injection." (R. 380).

Plaintiff saw Dr. Minor on March 30, 2010 and reported chronic intermittent low back pain and intermittent left lower extremity radicular symptoms. (R. 375). Plaintiff estimated her pain as 7–8 on average, but 5 with medication. (R. 375). Plaintiff stated that she was using the interferential nerve stimulation device at night and that it helped. (R. 375). Dr. Minor noted that Plaintiff's insurance "did not approve caudal epidural injection." (R. 375). Dr. Minor found on examination that flexion was 40 degrees and extension 10 degrees, muscle strength was 5/5, sensation was normal, and straight leg raise was negative. (R. 376–77). Plaintiff reported that she was taking Tramadol daily but that she found "it only helps a little and sometimes hardly touches

the pain," and she requested "stronger medication." (R. 375). Dr. Minor discontinued Tramadol, prescribed hydrocodone, and continued Lyrica, Mobic, and Skelaxin. (R. 377).

Plaintiff returned to see Dr. Minor on April 28, 2010. (R. 372). Plaintiff estimated her pain as 7–8 on average but 5 with medication. (R. 372). Plaintiff reported using "interferential nerve stimulation at night which does help." (R. 372). Dr. Minor noted that flexion was 30 degrees and extension was 10 degrees, muscle strength was 5/5, straight leg raise was negative, and sensation was normal. (R. 374). Plaintiff declined "injection intervention including epidural steroid injection." (R. 374).

### c.    St. Elizabeth Medical Center Emergency Department

Police brought Plaintiff to the St. Elizabeth Center Emergency Department on March 27, 2011. (R. 409, 531–40). According to the emergency department records, Plaintiff took an overdose following a conflict with her girlfriend. (R. 410). Plaintiff indicated that she was homeless and that she was not suicidal. (R. 410). Dr. Suresh Rayancha, MD, conducted a psychiatric evaluation and found that Plaintiff was "functioning at a normal range of intelligence," her "[m]ood and affect" were appropriate, she was "[w]ell oriented x3," her speech was "clear and coherent," there was no "flight of ideas or looseness of association" or suicidal thoughts, her memory was intact, and there was no evidence of "psychosis or organicity." (R. 411). Dr. Rayancha diagnosed adjustment disorder with mixed emotional features. (R. 411). Plaintiff was hospitalized until April 4, 2011. (R. 409).

Plaintiff returned to the emergency department on April 9, 2011 with an injury to her left ankle. (R. 405, 527–30). Plaintiff stated that she lost her footing and fell. (R. 406). Plaintiff was given ibuprofen, crutches, and an air cast. (R. 406).

Plaintiff went to the emergency department on July 17, 2011, complaining of back pain after she "fell off her bike about 3 days" before. (R. 513). Plaintiff reported that the pain "has

come and gone for over a month" and that she had shooting pain into the left leg, back pain that is "worse with movement," and "numbness and tingling affecting the left lower extremity." (R. 401, 513). Plaintiff was treated with an anti-inflammatory, a muscle relaxant, and hydrocodone. (R. 516). X-rays showed "some degenerative joint changes" but indicated that the hardware was intact. (R. 516). Plaintiff was discharged the same day with prescriptions for a muscle relaxant and ibuprofen. (R. 517).

### d.    Dr. Bharat Langer, MD

On June 29, 2011, Plaintiff underwent a psychiatric evaluation by Bharat B. Langer, MD, at Human Technologies Corporation Mental Health Connections. (R. 421). Plaintiff complained of "poor sleep, poor appetite, and difficult focusing and concentrating." (R. 421). Dr. Langer performed a mental status exam and observed that Plaintiff's mood was "subdued, dysphoric" her affect was "reactive," "[s]he was able to express herself appropriately," "[s]he was alert and oriented x 3," "recent and remote memory was grossly intact," and "insight and judgment were okay." (R. 421). Dr. Langer diagnosed depressive disorder and prescribed Zoloft. (R. 422). Dr. Langer explained that Plaintiff's "presentation is consistent with depressive symptomatology," and believed she "could benefit from psychopharmacological and psychotherapeutic interventions." (R. 422).

Plaintiff returned to see Dr. Langer on July 13, 2011 and reported that the Zoloft was making her sleepy. (R. 420). Dr. Langer observed that Plaintiff's mood was stable, that her "[a]ffect was restricted," and that she "was alert and oriented x3." (R. 420). Dr. Langer found Plaintiff's "recent and remote memory was grossly intact" and her "insight and judgment were okay at the time of interview." (R. 420). On July 27, 2011, Plaintiff saw Dr. Langer and reported she was tolerating Zoloft "much better" and was "sleeping better." (R. 419). Dr. Langer noted

that Plaintiff's mood "was stable" and that "[c]ognitively, she was grossly intact." (R. 419). Dr. Langer advised Plaintiff to continue taking Zoloft and to continue psychotherapy. (R. 419).

Plaintiff saw Dr. Langer on September 16, 2011 and reported that she was "doing very good" and had no anxiety or "sleep or appetite disturbances." (R. 426). Dr. Langer observed that Plaintiff's mood was stable and that her affect was reactive, and he found that "[c]ognitively, she was grossly intact." (R. 426). Dr. Langer noted that Plaintiff was "showing good symptom control" and that there was "no evidence of any psychiatric decompensation." (R. 426). Plaintiff saw Dr. Langer six more times between October 26, 2011 and May 2, 2012. (R. 439, 501–05).

### e.    Dr. Cynthia Jones, MD

Plaintiff saw Dr. Cynthia L. Jones, MD, at the Utica Community Health Center on July 9, 2012 for a physical. (R. 508). Plaintiff reported "right rib pain off and on for the past few days." (R. 509). On physical examination, Dr. Jones noted rib tenderness laterally and noticed that Plaintiff's back was "tender to palpation of lumbar-sacral spine." (R. 509). Dr. Jones observed that Plaintiff was alert and oriented, her cognitive function was intact, her "judgment and insight good," her affect was flat, her speech was clear, and her "thought process logical, goal directed." (R. 509).[16]

### f.    Linda Talarico, NP

On July 2, 2012, Plaintiff began seeing Linda Talarico, a psychiatric nurse practitioner at Human Technologies Corporation Mental Health Connections, for "routine medication management and psychiatric progress review." (R. 499). They discussed Plaintiff's matriculation at Mohawk Valley Community College ("MVCC") and plan to take an 18-hour course-load while also working 17 hours per week. (R. 499). NP Talarico performed a mental status exam

---

[16] Plaintiff returned to Dr. Jones' office on August 6, 2012 "to follow up on labs." (R. 506–07).

and noted that Plaintiff was "oriented x 3," that her mood was stable and her affect was good, that she was euthymic, that cognitively, she was "grossly intact," and that she was "motivated in her education endeavors." (R. 499). Plaintiff saw NP Talarico on July 30, 2012; Plaintiff's mental status was similar to what it had been at her previous appointment. (R. 498).

On August 30, 2012, Plaintiff saw NP Talarico and reported that she was "taking 18 hours of credit at MVCC for data processing and she is completely exhausted" and has been "unable to fulfill her obligation for her 17 hours a week at the Emmaus House for her public assistance check." (R. 497). Plaintiff reported "some problems with sleep but no problems with her appetite." (R. 497). Talarico added Remeron[17] "for sleep" and continued Plaintiff's prescription for Zoloft. (R. 497).

During an examination on December 12, 2012, Talarico found Plaintiff "oriented x3," and "able to make her needs known," and indicated that "[c]ognitively, she is grossly intact." (R. 496). On February 11, 2013 NP Talarico noted that Plaintiff "continues to do part-time volunteering at Emmaus House and she is in school full-time taking many courses." (R. 495). NP Talarico reported that, on mental status examination, Plaintiff was "oriented x3," was "able to make her needs known," had "good" insight and judgment, was "productive and going to school," and was "grossly intact cognitively." (R. 495). On March 18, 2013, NP Talarico observed that Plaintiff "has been stable since the last few visits." (R. 494). Plaintiff reported that she had "no problems with sleep or appetite, that her "focus and concentration have improved," and that she "continues to be engaged in society and has worked at HTC." (R. 494). Talarico performed a mental status examination and found Plaintiff to be "oriented x 3," "stable and

---

[17] "Remeron (mirtazapine) is an antidepressant. The way mirtazapine works is still not fully understood. It is thought to positively affect communication between nerve cells in the central nervous system and/or restore chemical balance in the brain." https://www.drugs.com/remeron.html (last visited Mar. 14, 2019).

unchanged," "[c]ognitively, grossly intact," and "stable mood and affect." (R. 494). NP Talarico stated that Plaintiff "is at baseline psychiatrically and is doing well overall." (R. 494).

Plaintiff saw NP Talarico four times between July 2013 and July 2014. (R. 976–83). On July 29, 2013, Plaintiff reported to NP Talarico that she would not be able to return to school that semester due to "a lapse in her financial aid" after she failed two math classes. (R. 976). Although Plaintiff was in a "low mood," she denied having "any thoughts of self-harm." (R. 976). NP Talarico increased Plaintiff's dosage of Remeron on October 21, 2013. (R. 978). On May 2, 2014, Plaintiff reported that she was experiencing "some anxiety" and feeling "uncomfortable being out in public," but that she was "doing fairly well" and "denie[d] depression." (R. 981). NP Talarico noted that Plaintiff was "awake, alert, and oriented x 3" and "neat, clean, well dressed[,] and well groomed." (R. 981). On July 18, 2014, NP Talarico observed that, during her appointment, Plaintiff was "scratching herself constantly for 15 minutes" and had "a lot of bedbug bites up and down both arms." (R. 983). NP Talarico noted that, aside from the "profoundly excessive" scratching, Plaintiff appeared "awake, alert, and oriented x 3." (R. 983).

### g. Robert Marsh, NP, and Dr. William Jorgenson, DO

On August 13, 2014, Plaintiff saw Robert Marsh, NP, at St. Elizabeth Medical Group Family Medical Specialty Clinic, complaining of low-back pain, as well as numbness and tingling in both legs. (R. 1074). Plaintiff reported that after her first surgery "she was ok for awhile and has been going down hill after a few years," and that she was experiencing "pain now 11/10 constant," which was relieved by lying down. (R. 1074). NP Marsh indicated that "[o]verall findings were normal," but that Plaintiff showed low-back tenderness and experienced pain performing straight leg raises to 30 to 40 degrees. (R. 1077). He diagnosed lumbago and prescribed naproxen and Flexeril. (R. 1077). Plaintiff saw Dr. William Jorgenson, DO, at St.

Elizabeth Medical Group, on September 17, 2014, complaining of lower-back pain. (R. 1071).

Dr. Jorgenson treated Plaintiff's lumbago and lumbosacral spasms of the paraspinal muscles by

"[o]steopathic manipulative treatment" and prescribed Flexeril. (R. 1073). Plaintiff reported that

her pain had improved from an 8 to a 6 out of 10. (R. 1073).

### h.      Upstate University Hospital Emergency Department

On November 25, 2014, Plaintiff was transported to the emergency department at Upstate

University Hospital. (R. 1352). She reported feeling a "pop" in her back while bending over,

after which she was unable to move due to the pain and unable to move her legs. (R. 1352). A

CT scan of Plaintiff's lumbar spine revealed "[d]egenerative changes causing moderate to severe

canal stenosis and moderate left neuroforaminal stenosis at L3-L4." (R. 1363). Plaintiff was

given valium, Toradol, and morphine, (R. 1358), and discharged on November 29, 2014,

(R. 1359).

### i.      Sylvia Redmond, NP

On April 15, 2015, Plaintiff saw NP Syliva Redmond at Human Technologies

Corporation Mental Health Connections. (R. 1197). Plaintiff reported that she "had gone to

Florida for approximately three months," where "she and her boyfriend went to a camp grounds

and just hung out down there and enjoyed the nicer weather." (R. 1197). NP Redmond indicated

that Plaintiff was "alert and oriented x3," but "anxious with congruent affect" after she got a

phone call "from her boyfriend stating that he fell down some stairs." (R. 1197). NP Redmond

recommended that Plaintiff continue taking Remeron and Zoloft. (R. 1197).

### j.      Catherine Tomaiuoli, NP

On April 20, 2015, Plaintiff saw NP Tomaiuoli and reported that she had been admitted

to the hospital in November 2014 after feeling a "pop" in her back. (R. 1149). Plaintiff stated

that, since her injury, she had been in Florida for three months. (R. 1149). She indicated that her

pain was an "8 out of 10," and that she "gets weakness, numbness, tingling, and pain in the right leg." (R. 1149). NP Tomaiuoli recommended an MRI and told Plaintiff that, "if we are going to proceed with any surgical intervention," Plaintiff would have to quit smoking and would not "be with Dr. Richard Tallarico until she has been off her nicotine for 3 weeks." (R. 1150). On April 29, 2015, Plaintiff spoke with NP Tomaiuoli over the phone and reported that her back symptoms were "worsening," and that she "now has swelling on the left side of her low back." (R. 1148). Plaintiff went to the emergency department, where she received injections of morphine and Toradol and was prescribed OxyContin, meloxicam, and Flexeril. (R. 1130).

On June 5, 2015, Plaintiff saw NP Tomaiuoli and reported that she was "20% improved" since her April 29, 2015 visit to the emergency department. (R. 1130). Plaintiff stated that "her low back pain is best when she is lying down" and "worse with sitting and/or walking." (R. 1130). NP Tomaiuoli noted that "[m]otor and testing of [Plaintiff's] lower extremities remains 5 out of 5." (R. 1130). She further indicated that Plaintiff underwent an MRI on June 3, 2015, which showed "degenerative disc disease at L3/L4 with facet hypertrophy and a mild disc bulge resulting in neural foraminal stenosis bilaterally with moderate severe central canal stenosis." (R. 1130). NP Tomaiuoli stated that she "would like to have [Plaintiff] try a caudal injection," but that if "she does not have improvement, she will need to quit smoking before proceeding with any further treatment in our hands." (R. 1130–31).

### k. St. Elizabeth Medical Center

On July 17, 2015, Plaintiff was taken by ambulance to the emergency department at St. Elizabeth Medical Center "following an intentional overdose on 18 prescription pain pills in a suicide attempt after an argument with her boyfriend about salad dressing." (R. 1020). Plaintiff denied experiencing "depression or anxiety" but appeared to be "guarded, vague[,] and unreliable" and "minimizing her suicide attempt in order to get discharged." (R. 1020). Although

hospital staff recommended inpatient treatment, (R. 1518, 1549), Plaintiff appears to have been discharged on July 18, 2015, (R. 1564), due to the unavailability of female psychiatric beds in the vicinity, (R. 1557, 1560).[18]

### 3. 2015 Hip Replacement and 2016 Spinal Decompression

#### a. Dr. Emil Azer, MD

On September 22, 2015, Plaintiff saw Dr. Amil Azer at Upstate University Hospital, complaining of "classic hip arthritic symptoms consisting of aching, burning, cramping[,] and grinding groin pain" on her right side. (R. 1126). Dr. Azer indicated that Plaintiff's "pain is progressive," and that her "goal at this time is to proceed with joint replacement." (R. 1126). Dr. Azer performed a right total hip replacement on December 7, 2015. (R. 1153–54). At her six-week, three-month, and six-month follow-up visits, Dr. Azer noted that Plaintiff was "[d]oing well" and that her hip was "stable with good range of motion" and "minimal discomfort." (R. 1138–40).

#### b. Sylvia Redmond, NP

On January 13, 2016, Plaintiff went to see NP Redmond for a medication check. (R. 1202). NP Redmond noted that Plaintiff "was ambulating with a cane and report[ed] that she had a total hip replacement on December 7, 2015." (R. 1202). Plaintiff reported that "her mood overall has been good" but that "the pain interrupts her sleep." (R. 1202). On April 6, 2016, Plaintiff went back to NP Redmond. (R. 1199). NP Redmond noted that Plaintiff was "ambulating without her cane" and was "walking somewhat better, but still [had] a bit of a limp." (R. 1199). Plaintiff reported "no pain in the hip but . . . some back pain" and was "doing well" otherwise. (R. 1199). NP Redmond noted that Plaintiff was "alert, oriented x3" and had "no

---

[18] On October 2, 2015, Plaintiff reported to NP Redmond that she "was hospitalized for a total of one week" after her July 2015 suicide attempt. (R. 1204).

concerns with sleep." (R. 1199). NP Redmond indicated that Plaintiff "continues chronic and stable psychiatrically." (R. 1199).

### c. Dr. Richard M. Tallarico, MD

On July 11, 2016, Plaintiff reported that after her hip replacement "her right buttock pain [had] resolved," but that "[s]he continues with her low back pain that has been worsening." (R. 1137). Plaintiff stated that an injection did not improve her pain, which was "as high as 11 out of 10 but did improve down to a 7 out of 10 after hip replacement." (R. 1137). She also indicated that she "would like to be considered for surgical intervention." (R. 1137). Dr. Tallarico noted that Plaintiff "has exhausted conservative care." (R. 1137). On August 8, 2016, Plaintiff saw Dr. Tallarico and NP Tomaiuoli for her "functioning disabling low back pain" and to review results of her July 11, 2016 MRI. (R. 1115). Dr. Tallarico noted "significant facet hypertrophy with facet cyst resulting in severe central stenosis at L3–4 as well as bilateral foraminal stenosis at L3–4." (R. 1115). He also "discussed surgery in the form of revision posterior lumbar decompression with instrument effusion extending to L3." (R. 1116).

On August 24, 2016, Dr. Tallarico performed several surgical procedures on Plaintiff's back, including a posterior lumbar decompression, facet cyst resection, and a posterior arthrodesis of L3–5 with grafting. (R. 1151). At a September 8, 2016 follow-up appointment, Plaintiff reported that she was "doing well" and that "her pain that she complained of preoperatively has completely resolved." (R. 1108). She indicated that she was only taking oxycodone occasionally. (R. 1108). Examination notes indicate that Plaintiff showed "5/5 strength" in her extremities, "[s]ensation grossly intact to touch," and symmetric reflexes. (R. 1108). Dr. Tallarico instructed Plaintiff to "avoid heavy lifting, bending[,] or twisting," but encouraged her to "walk as much as she would like and to use her cane as needed for balance." (R. 1109).

#### 4. Treatment After Hip Replacement and Back Surgery

##### a. Sylvia Redmond, NP

On September 21, 2016, Plaintiff saw NP Redmond for a medication check. (R. 1214). NP Redmond indicated that there were no changes since Plaintiff's last visit, but that following her back surgery, Plaintiff was "ambulating with a limp and a cane." (R. 1214). Plaintiff reported that "her psychoactive medications [were] working well for her." (R. 1214). NP Redmond noted that Plaintiff presented "chronic and stable psychiatrically." (R. 1214). On January 4, 2017, Plaintiff returned to NP Redmond for a medication check. (R. 1266). Plaintiff reported that she had been out of town "taking care of her ex-boyfriend's mother." (R. 1266). NP Redmond noted that Plaintiff continued "ambulating with a limp and a cane," and that Plaintiff stated "that she sometimes has difficulty with sleep due to the back pain." (R. 1266). NP Redmond further noted that Plaintiff "presents chronic and stable psychiatrically," and continued Plaintiff on Remeron and Zoloft. (R. 1267–68).

##### b. Dr. Gregory Marra, MD

On April 17, 2017, Plaintiff saw Dr. Gregory Marra at MVHS Family Medicine Center. (R. 1581–84). Plaintiff reported that her "mood has been good." (R. 1581). She stated that, although "she has some bilateral lower extremity numbness due to her recent L3–L5 surgery at Upstate," she was "feeling well otherwise." (R. 1581). Aside from flea bites, Plaintiff had "no other complaints." (R. 1581). Plaintiff reported back pain at a 7 out of 10. (R. 1583). Dr. Marra noted "[p]hysical disability due to right hip pain," but indicated that Plaintiff was capable of "[n]ormal activities of daily living" and "[i]n no acute distress." (R. 1583). He further noted that

Plaintiff's mood was "[n]ot depressed," "[n]ot anxious," and "[n]ot irritable." (R. 1584). Dr. Marra indicated that Plaintiff's PHQ-2 Total Score was zero.[19] (R. 1297).

Plaintiff saw Dr. Marra again on May 16, 2017 for a pre-operative exam for "multiple tooth extractions" and reported "no complaints" that day. (R. 1576). Plaintiff reported a pain level of 0 out of 10. (R. 1578). Dr. Marra noted lower-back tenderness on palpation of the left and right paraspinal regions but no "costovertebral angle tenderness." (R. 1291). Dr. Marra again noted that Plaintiff was "[i]n no acute distress" and able to undertake "[n]ormal activities of daily living." (R. 1290).

### c.      Daniel Birklin, PA

On May 5, 2017, Plaintiff visited Dr. Emil Azer's office for a follow-up appointment with Daniel Birklin, PA. (R. 1607). PA Birklin noted that Plaintiff "was last seen in the office by Dr. Azer" on June 7, 2016. (R. 1607). Plaintiff reported that she was "doing well, but . . . developed some lateral pain in her hip." (R. 1607). PA Birklin noted that Plaintiff walked with a "[s]low, purposeful gait with the use of a cane" and that she had "significant tenderness to firm palpation of the greater trochanter." (R. 1607). He noted that, although "she appears to be doing well with regards to her hip replacement," she had "new findings of trochanteric bursitis." (R. 1608). On June 12, 2017, Plaintiff reported that she was "doing exceeding well" after her hip replacement, and denied "any instability, weakness, or groin pain." (R. 1616). She reported continued pain "when lying on her right side," and PA Birklin noted that she continued to walk with a "[s]low, purposeful gait with the use of a cane." (R 1616). PA Birklin administered a

---

[19] The Patient Health Questionnaire ("PHQ-2") "inquires about the degree to which an individual has experienced depressed mood and anhedonia over the past two weeks. Its purpose is not to establish final diagnosis or to monitor depression severity, but rather to screen for depression." *Patient Health Questionnaire (PHQ-9 & PHQ-2)*, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health. "[I]ndividuals scoring low ($\leq 4$) on the [PHQ] had a less than a 1 in 25 chance of having depression." *Id.*

"trochanteric bursal space injection with corticosteroid," after which Plaintiff reported

"significant improvement in her tenderness with palpation over the trochanteric bursa."

(R. 1616–17). Plaintiff stated that she would be "very busy over the next few months" but would

"call if she require[d] an appointment." (R. 1617).

### d.    Dr. Gregory Marra, MD

Plaintiff returned to see Dr. Marra on July 19, 2017. (R. 1590). Plaintiff had "no

complaints at this visit" but indicated that, "due to her back and hip issues, [she] has not been

able to do as much physical activity as she would like." (R. 1590). Plaintiff reported back pain at

a 6 out of 10. (R. 1592). Dr. Marra noted Plaintiff's "disability due to right hip pain" but

indicated that she was capable of "[n]ormal activities of daily living." (R. 1592). He also

indicated that Plaintiff's PHQ-2 Total Score was zero. (R. 1593).

### F.    Opinion Evidence

### 1.    Dr. Kenneth Ortega, DO—Orthopedic Independent Evaluation

On May 13, 2009, Plaintiff was examined by Kenneth D. Ortega, DO, for an orthopedic

independent medical evaluation. (R. 381–84). On physical examination, Dr. Ortega found "flip

test to be negative" and determined that "[d]eep tendon reflexes are symmetrical and brisk,

motor strength was 5/5." (R. 382). Plaintiff "denied any radiculopathy to her extremities."

(R. 382). Dr. Ortega found "[s]traight leg raising was negative for any radiculopathy," but

straight leg raising "on the left reproduced some lower lumbar discomfort." (R. 382). Dr. Ortega

observed that "[o]n erect posture the patient stood straight," and noted that Plaintiff "described

discomfort to the left of the midline along the left iliac crest" and "had increased discomfort side

bending to the left and slightly with extension, but no pain on rotation." (R. 382). Plaintiff could

"forward flex to 90 degrees and return to the neutral position" and do "serial toe rises and heel

rises without difficulty." (R. 382).

Dr. Ortega reviewed Plaintiff's x-rays and a CT scan, as well as some of her medical records. (R. 383). Dr. Ortega diagnosed residual low-back pain "posterior lumbar decompression with interbody arthrodesis at the L4-5 level." (R. 383). Dr. Ortega opined that Plaintiff was "maintaining a moderate level of partial temporary disability" and that it "[a]ppears the patient is disabled from her usual and customary job" but "would be eligible for a sedentary, light job that would not involve any specific twisting type activities of the lumbar spine of lifting greater than 10 [pounds]." (R. 383).

### 2.   Dr. Gregory B. Shankman, MD—VESID[20] Examination

On July 26, 2011, Plaintiff underwent a "VESID Examination" by Gregory B. Shankman, MD, an orthopedic surgeon. (R. 423). On examination, Dr. Shankman found that Plaintiff had "flexion to 20 degrees, extension to 15 degrees with 10 degrees of side bending to each side 10 degrees of right and left rotation." (R. 423). Dr. Shankman found Plaintiff had "good" muscle strength, ambulated "with a heel/heel and toe/toe gait," and exhibited negative straight leg raising bilaterally. (R. 423). Dr. Shankman opined that Plaintiff:

> has reached maximum medical improvement, requires no further treatment and has a moderate partial disability and could work at a light duty level keeping her lifting to at 25 pounds or less, carrying 25 pounds or less. She cannot do rapid or repetitive motion with the back. She will need to sit and stand at her own volition. She cannot work in cramped or confined positions.

(R. 423).

### 3.   Dr. Kalyani Ganesh, MD—Consultative Internal Medicine Examination

On December 22, 2011, Plaintiff underwent a consultative internal medicine examination by Kalyani Ganesh, MD (R. 441). Plaintiff told Dr. Ganesh that she "suffered a work-related

---

[20] VESID stands for "Vocational and Educational Services for Individuals with Disabilities."

injury" in June 2008 and underwent a lumbar fusion on November 2008. (R. 441). Plaintiff indicated that "[t]he last time she saw a surgeon was in 2010." (R. 441). Plaintiff reported that she "still has lower back pain that comes and goes about five times a week." (R. 441). Plaintiff stated that "[w]hen the pain comes, it lasts for about a whole day." (R. 441). Plaintiff did "not offer any complaints regarding the knee" but reported that she suffered from depression. (R. 441). With respect to her daily living activities, Plaintiff indicated that she cooks "two or three times a week," cleans, does laundry, and shops once a week. (R. 441). Plaintiff stated that she showers and dresses daily and watches televisions, socializes, reads, and plays video games in her free time. (R. 441–42).

Dr. Ganesh observed that Plaintiff "appeared to be in no acute distress," had a normal gait, could "walk on heels and toes without difficulty," "squat full," had a normal stance, "[n]eeded no help changing for exam or getting on and off exam table," and was "[a]ble to rise from chair without difficulty." (R. 442). On physical examination, Dr. Ganesh found that Plaintiff's cervical spine "shows full flexion, extension, lateral flexion bilaterally, and full rotary movement spine." (R. 443). Dr. Ganesh found Plaintiff had "[l]umbar spine flexion 45 degrees, extension 10 degrees, bilaterally" and "[h]ip flexion 90 degrees, backward extension full, interior full, abduction full, exterior 25 degrees, adduction 20 degrees." (R. 443). Dr. Ganesh noted that Plaintiff had lumbar spine tenderness. (R. 443). Dr. Ganesh diagnosed "[s]tatus post lumbar fusion," "[l]ower back pain," and [s]prained left knee." (R. 443). Dr. Ganesh opined that Plaintiff had no "gross limitation" "sitting, standing, or walking" but "a moderate limitation lifting, carrying, pushing, and pulling." (R. 443).

### 4. Dr. Michael Alexander, Ph.D.—Consultative Psychiatric Examination

On January 31, 2012, Plaintiff underwent a consultative psychiatric examination by Dr. Michael Alexander, Ph.D. (R. 445). Dr. Alexander indicated that Plaintiff "has seen a

psychiatrist and therapist on a monthly and bimonthly basis in an outpatient clinic" since April 2010. (R. 445). Plaintiff reported having "normal sleep and appetite" and "a history of dysphoric mood since her mother died in 07/10." (R. 445). Plaintiff stated that medication helps to "reduce the intensity of her symptoms 60% to 70%." (R. 445). Dr. Alexander found "no evidence of panic or manic related symptoms, thought disorder, or cognitive deficit." (R. 445).

Dr. Alexander conducted a mental status examination and found that Plaintiff was "cooperative, friendly, and alert" and that "[h]er manner of relating and social skills were adequate." (R. 446). Dr. Alexander further found that Plaintiff's "[e]xpressive and receptive language was adequate for normal conversation," her thought processes were "coherent," her affect "[o]f full range and appropriate in speech and thought content," she was oriented "x3," attention and concentration were "[i]ntact," she was "able to count, perform simple calculations, and serial 3s," her recent and remote memory skills were "[i]ntact," her cognitive functioning was "[a]verage," "general fund of information was appropriate to her age," and her insight and judgment were "good." (R. 446–47). Dr. Alexander indicated that Plaintiff was "able to dress, bathe, and groom herself"; was able to "cook, clean, shop, manage her own money," and take public transportation; had friends "but is not close to any family members"; and "watches TV, and likes to play video games." (R. 447).

Dr. Alexander opined that Plaintiff's "psychiatric problems" were not "significant enough to interfere with the claimant's ability to function on a daily basis" and that she was able to "follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, . . . appropriately deal with stress," and "manage her own funds." (R. 447–48).

### 5.     Dr. Elke Lorensen, MD—Consultative Internal Medicine Examination

On April 29, 2015, Dr. Elke Lorensen conducted an internal medicine examination of Plaintiff. (R. 992). Plaintiff stated that she "had lumbar spine surgery some time in the past about a year ago," and complained of pain that was "always there and is aggravated by all movements." (R. 992). Dr. Lorensen noted that Plaintiff walked with a cane, and Plaintiff said "the doctor gave it to her" because of "constant numbness in her legs." (R. 992). Dr. Lorensen stated that Plaintiff "appeared to be in no acute distress" and noted that her gait "without the cane is normal," which led him to opine that "the cane is not medically necessary." (R. 993). He noted that Plaintiff showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally," as well as "strength 5/5" in her grip and extremities. (R. 994). Dr. Lorensen opined that Plaintiff was "complaining of an exorbitant amount of pain . . . out of proportion to findings," (R. 992), but diagnosed back pain and "[s]tatus post lumbar spine surgery." (R. 994). He further stated that Plaintiff had "no gross limitations to sitting, standing, walking, and handling small objects with the hands" and had "moderate restrictions to bending, lifting, and reaching." (R. 994).

### 6.     Dr. Jeanne Shapiro, Ph.D.—Consultative Psychiatric Examination

On April 29, 2015, Dr. Jeanne Shapiro, Ph.D., conducted a psychiatric examination of Plaintiff. (R. 986). Dr. Shapiro noted that Plaintiff walked to the examination, a distance of approximately two miles, "with frequent stops." (R. 986). Dr. Shapiro indicated that Plaintiff's "manner of relating, social skills, and overall presentation was adequate," her "[e]ye contact was appropriate," and her "thought processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking." (R. 988). Plaintiff "report[ed] that she is able to dress, bathe, and groom herself," could "warm food in the microwave and prepare simple

food," "cannot do general cleaning, laundry, or shopping," and could "manage money . . . and use public transportation." (R. 988). Dr. Shapiro opined that Plaintiff appeared to have no limitations in: "understanding and following simple instructions and directions," "performing simple tasks," "performing complex tasks," "maintaining attention and concentration for tasks," attending "a routine and maintain[ing] a schedule," "learn[ing] new tasks," or "mak[ing] appropriate decisions." (R. 989). She further stated that Plaintiff appeared to have mild limitations in "her ability to consistently relate to and interact well with others" and "deal with stress." (R. 989). Dr. Shapiro diagnosed "adjustment disorder [with] mixed features" and "back pain." (R. 989). She concluded that, overall, Plaintiff's psychiatric symptoms "do not appear to be significant enough to interfere with [her] ability to function on a daily basis" and "barely warrant a formal diagnosis." (R. 989).

### 7. Dr. Rita Figueroa, MD—Consultative Internal Medicine Examination

On December 2, 2016, Plaintiff saw Dr. Rita Figueroa, MD, for a consultative internal medicine examination. (R. 1226). Plaintiff reported to Dr. Figueroa that after her 2008 back surgery she "did well until 2014 when the pain started becoming gradually worse." (R. 1226). Plaintiff indicated that after her 2016 back surgery she had "constant pain on an average of 6." (R. 1226). While the surgery "improved her walking" and she "was able to walk the day of the interview five blocks," Plaintiff still relied on a cane "to help with balance, mainly used outdoors." (R. 1226–27). Plaintiff indicated that she cooked meals twice a week but did "not do any cleaning, laundry, or shopping." (R. 1227). Dr. Figueroa observed that Plaintiff appeared to be "in no acute distress," walked with a "[m]oderate limping gait," could "walk on heels and toes without difficulty," "[n]eeded no help changing for exam or getting on and off exam table," and was able to "rise from chair without difficulty." (R. 1227). She noted that Plaintiff's "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement

bilaterally," and "[s]trength 5/5 in the upper and lower extremities." (R. 1228). Dr. Figueroa opined that Plaintiff "will have moderate limitation to repetitive bending, lifting, and carrying and mild limitation to prolonged walking and standing." (R. 1229).

### 8. Dr. Jacqueline Santoro, Ph.D.—Consultative Psychiatric Examination

On December 2, 2016, Plaintiff saw Dr. Jacqueline Santoro, Ph.D., for a consultative psychiatric evaluation. (R. 1221). Dr. Santoro indicated that Plaintiff's appearance, speech, and thought processes were normal, but that her "mood was dysthymic." (R. 1222). She observed that Plaintiff's attention, concentration, and memory skills were "intact." (R. 1223). Plaintiff reported that she could "dress, bathe, and groom herself," as well as "cook and prepare food, manage money, and drive." (R. 1223). She further indicated that her boyfriend did the "cleaning, laundry, and shopping." (R. 1223). Dr. Santoro opined that Plaintiff could "[f]ollow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, and learn new tasks." (R. 1223). She stated that Plaintiff had "no limitation in maintaining a regular schedule," "[m]ild limitations in making appropriate decisions," and moderate limitations in relating with others and dealing with stress." (R. 1223). Dr. Santoro concluded that the results of Plaintiff's evaluation "appear to be consistent with psychiatric problems, but in and of themselves, they are not enough to interfere with her ability to function on a daily basis." (R. 1224).

### 9. Sylvia Redmond, NP—Medical Source Statement

On May 23, 2017, Plaintiff's treating psychiatric nurse practitioner, NP Redmond, completed a medical source statement.[21] (R. 1347). The statement indicates that Plaintiff was diagnosed with depressive disorder and anxiety. (R. 1347). Among the "signs and symptoms"

---

[21] The medical source statement indicates that it was completed by Donna Saville, RN, and was signed by NP Redmond. (R. 1349).

exhibited, the statement indicates that Plaintiff showed "[p]ervasive loss of interest in almost all activities," "[d]ecreased energy, "[t]houghts of suicide/harming others," "[g]eneralized persistent anxiety," "[e]asy distractibility," and "[s]leep disturbance." (R. 1348). NP Redmond's statement indicates that Plaintiff would be "seriously limited, but not precluded" by her inability to attend a job regularly and punctually, work in coordination or proximity to others, respond appropriately to changes in work setting, maintain socially appropriate behavior, and travel in unfamiliar places. (R. 1348). The statement further indicates that Plaintiff would be "unable to meet competitive standards with regard to her ability to "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms" and "[p]erform at a constant pace without an unreasonable number and length of rest periods." (R. 1348). NP Redmond's statement concludes that Plaintiff's impairments were "likely to produce 'good' and 'bad' days," and that Plaintiff would likely be off task at a job more than 20% of the time and absent more than four days per month. (R. 1349–90).

### 10.    Dr. Dorothy Leong, MD—Medical Source Statement

On July 11, 2017, Dr. Dorothy Leong, MD, completed a medical source statement and medical interrogatory after reviewing Plaintiff's medical record. (R. 1379–90). After summarizing the medical visits, surgeries, and opinions in the record, Dr. Leong opined that Plaintiff retained "the ability to lift and carry 20 pounds occasionally and 10 pounds frequently[,] [s]it 6 hours in an 8 hour work day, [and] stand and walk a total of 4 hours." (R. 1389). Dr. Leong stated that Plaintiff "require[d] use of a cane but this is considered to be temporary" because Plaintiff had undergone lumbar fusion surgery in August 2016. (R. 1389). Accordingly, Dr. Leong did "not anticipate the need for [the cane] beyond a 3–6 month period of time following her surgical intervention." (R. 1389). Dr. Leong further opined that Plaintiff could use ramps and stairs occasionally, could never use ladders or scaffolds, could balance and stoop

continuously, could kneel and crouch occasionally, could never crawl, and "should avoid unprotected heights." (R. 1390).

### 11.    Dr. Emil Azar, MD—Medical Source Statement

On July 13, 2017, Dr. Emil Azar, MD, completed a medical source statement.[22] (R. 1585–89). Dr. Azar indicated Plaintiff's diagnosed impairments were status post right total hip replacement and trochanteric bursitis with an onset date of September 2015. (R. 1585, 1589). He indicated that Plaintiff did not have any difficulty ambulating or balancing and did not require elevation of the legs with prolonged sitting. (R. 1585). He opined that Plaintiff could sit for more than two hours a time, and for at least six hours out of an eight-hour workday with normal breaks. (R. 1586). Dr. Azar further indicated that Plaintiff could stand for more than two hours a time, and for "about 4 hours" in an eight-hour workday with normal breaks. (R. 1586). He opined that Plaintiff did not need a job that permits shifting positions at will from sitting, standing, or walking. (R. 1586). He indicated that, although Plaintiff required the use of a cane, she could frequently lift up to 20 pounds, twist, stoop/bend, climb stairs, grasp, and reach. (R. 1587). Dr. Azar opined that Plaintiff could only occasionally climb ladders and could only rarely lift objects over 50 pounds, crouch, or squat. (R. 1587). He further indicated that, based on Plaintiff's "overall impairments and work-related limitations," she should would be off task 10% of the time during an eight-hour workday but would not need to take unscheduled breaks. (R. 1587). Dr. Azar estimated that Plaintiff would never be absent from work as a result of her impairments or treatment. (R. 1588).

---

[22] The medical source statement indicates that it was completed by Daniel Birklin, PA, and was signed by Dr. Emil Azar, M.D. (R. 1588–89).

### 12.    Dr. Gregory Marra, MD—Medical Source Statement

On August 10, 2017, Dr. Gregory Marra, MD, completed a medical source statement regarding Plaintiff's functional limitations as a result of her impairments. (R. 1676). He indicated that Plaintiff had been under his care since April 18, 2016, "but that due to inspection of medical records," his assessment that Plaintiff's limitations "existed and persisted to the same degree" since June 1, 2008 was accurate. (R. 1676). Dr. Marra opined that, as a result of her impairments, Plaintiff could sit for 15 minutes at a time and stand for 20 minutes at a time. (R. 1673). In an eight-hour workday, Dr. Marra estimated that Plaintiff could only sit, stand, or walk for a total of two hours, and would need a job that permitted her to shift positions at will from sitting, standing, or walking. (R. 1674). He indicated that Plaintiff could: (i) never lift or carry objects, stoop or bend, crouch or squat, climb ladders, or hold her head in a static position; (ii) rarely twist; and (iii) occasionally climb stairs, look down, and reach. (R. 1674). Dr. Marra stated that Plaintiff would need unscheduled breaks every hour during an eight-hour workday and would have to rest "2–3 days" before returning to work. (R. 1675). He further estimated that Plaintiff would be off task more than 20% of the time during an eight-hour workday, would be prone to "good" and "bad" days, and would likely be absent from work more than four days per month. (R. 1675).

### G.    ALJ's Second Decision Denying Benefits

On November 9, 2017, ALJ Fein issued a decision denying Plaintiff's claim for disability benefits. (R. 599–614). In reaching that conclusion, the ALJ applied a "five-step sequential evaluation process for determining whether an individual is disabled." [23] The ALJ's analysis at each step is summarized below.

---

[23] Under the five-step analysis for evaluating disability claims:

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since June 1, 2008, the alleged onset date of her disability. (R. 602). At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c) and 416.920(c), Plaintiff had six severe impairments: degenerative disc disease of the lumbar spine, status post-surgery x2, status post total right hip replacement, hip bursitis, depression, and anxiety. (R. 602). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 602 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926)).

### 1. Plaintiff's RFC

Because Plaintiff's impairments did not meet or equal a listed impairment at step three, the ALJ then assessed Plaintiff's residual functional capacity ("RFC").[24] The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." (R. 605).

---

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (alteration in original) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted)). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[24] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

In support of this finding and the overall RFC, the ALJ outlined specific items in Plaintiff's medical and treatment history, and assigned the following weights to the various medical opinions contained within the record regarding Plaintiff's physical limitations:

1. The ALJ gave "great weight" to the opinion of Dr. Dorothy Leong, a non-examining "medical expert with a specialty in physical medicine and rehabilitation," because it was "consistent with and supported by the medical evidence of record," "consistent with the clinical findings of record," and "broadly consistent with the opinions of Drs. Ganesh, Lorensen, Figueroa, Shankman, Ortega, and Azar . . . that the claimant retains the ability to perform basic exertional work tasks." (R. 608–09).

2. The ALJ gave "great weight" to the assessment of Dr. Azar and PA Birklin, who treated Plaintiff's hip bursitis, because it was consistent with the "evidence that [Plaintiff] had good responses to the back and hip surgeries, had resolution of her back pain after the August 2016 back surgery, [and] had a good response to the right hip surgery such that she went almost 12 months without seeing her orthopedic physician." (R. 609). The ALJ further noted that Dr. Azar and PA Birklin's opinions were "consistent with the clinical findings of record showing some range of motion limitations of the lumbar spine, with tenderness of the low back area, but with intact sensation, reflexes and strength of the upper and lower extremities." (R. 609).

3. The ALJ accorded "little weight" to the assessment of Dr. Marra, Plaintiff's "current primary care provider," because: (i) Dr. Marra "first saw [Plaintiff] in April 2017" but "nevertheless indicat[ed] that his opinion appli[ed] back to 2008[] without providing an explanation in his checkbox report to support his finding"; (ii) Dr. Marra's opinion on Plaintiff's exertional limitations was "not supported by his own examinations" of Plaintiff, which generally showed "benign findings"; (iii) Dr. Marra's "extremely restrictive assessment" was inconsistent with the "evidence from other care providers and evaluators showing generally only some range of motion limitations of the lumbar spine and tenderness of the low back area, but with no sensory, reflex[,] or strength limitations"; (iv) Dr. Marra's opinion that Plaintiff would "be off task more than 30% of the workday and miss[] 4+ days of work per month" was "not supported by [his] own examinations or those of any other care provider or evaluator"; (v) Dr. Marra's assessment was "contrary" to the opinions of Drs. Leong, Ganesh, Lorensen, Figueroa, Shankman, and Ortega; and (vi) Dr. Marra's opinion was contrary to the opinion of Dr. Azar and PA Birklin, who had "treat[ed] [Plaintiff] for several years." (R. 610).

4. The ALJ gave "great weight" to the opinions of consultative and evaluative examining Drs. Ganesh, Lorensen, Figueroa, Shankman, Ortega and a "State Agency program physician," because, "although [their] assessments differ somewhat in there [sic] details, they are all consistent in opining that [Plaintiff] retains the ability to perform light work at some level of exertion." (R. 610).

The ALJ concluded that, as to the opinions of Plaintiff's exertional limitations, "there is only one physical assessment of record, from Dr. Marra, that would support a finding that [Plaintiff] can perform significantly less than sedentary work, while all other physical assessments of record show the ability to perform at least sedentary work or work up to the level of light." (R. 611).

Regarding Plaintiff's nonexertional limitations, the ALJ accorded the following weights to the opinions of Plaintiff's psychiatric care providers and consultative examiners contained in the record:

1. The ALJ gave "little weight" to the opinion of Sylvia Redmond, NP, because: (i) NP Redmond "applie[d] her assessment back to June 2008," although she first "saw [Plaintiff] in 2016" and Plaintiff "did not start mental health treatments until 2011"; and (ii) NP Redmond's opinions were not consistent with "the mental health progress notes that show [Plaintiff] is generally stable and responded well to medications," the lack of evidence indicating Plaintiff's "inability to perform activities of daily living," and "the somewhat benign mental status examinations of record from Drs. Shapiro, Alexander, and Santoro." (R. 611).

2. The ALJ accorded "great weight" to the opinions of the consultative examination assessments of Drs. Alexander, Shapiro, and Santoro because they were "consistent with the evidence that shows the claimant has been largely stable psychiatrically over time, even with consideration of the hospitalizations in 2011 and 2015, and that she has responded well to psychiatric medications." (R. 612).

With respect to these opinions, the ALJ concluded that: (i) "[t]here are no observations in the mental health progress notes that the claimant presented with attention deficits, problems with focusing[,] or lethargy[] such that an off task rating of 20% is justified"; and (ii) "the longitudinal evidence shows the claimant's mental status is stable, such that being absent from work 4+ days a month is not supported." (R. 611).

In assessing Plaintiff's RFC, the ALJ also stated that Plaintiff's testimony "about the intensity, persistence, and limited of effect of . . . her symptoms" was "inconsistent with the objective evidence of record." (R. 605). The ALJ noted that, notwithstanding Plaintiff's testimony, the medical records indicate that following her 2008 spinal fusion, Plaintiff "did well

post surgery" and "had a benign physical examination on April 30, 2009, with good ranges of motion, 5/5 motor strength, a full nonantalgic stride, [and] positive low back tenderness." (R. 606). Although Plaintiff developed bursitis in February 2009, the ALJ noted that Plaintiff's "last documented visit at a pain clinic was in December 2009,"[25] and that from 2010 to November 2014 "there is little evidence showing treatment for or complaints of low back discomfort" and "no documented visits with her orthopedic physicians." (R. 606). The ALJ further stated that, "despite [Plaintiff's] testimony of continuing problems" after her 2015 hip replacement, " the documentary evidence indicates that [Plaintiff] was 'doing well' post operatively, with uncomplicated wound healing, a stable joint with a good range of motion[,] and minimal discomfort with provocative hip testing." (R. 607). The ALJ also noted that Plaintiff "went 11 months without seeing her orthopedist in follow-up, from June 2016 to May 2017, which suggests that the hip replacement surgery was successful and not problematical, as [Plaintiff] had suggested in her testimony." (R. 607). With regard to her 2016 back surgery, the ALJ noted that "at a September 8, 2016 orthopedic follow-up, [Plaintiff] was noted to be 'doing well' and she reported that her preoperative back pain had 'completely resolved' such that she was taking Oxycodone only 'occasionally,'" despite her testimony that "her condition ha[d] gotten worse after the surgeries." (R. 606). Overall, the ALJ concluded that Plaintiff's "testimony of being able to sit and stand for no more than 10-20 minutes is not fully consistent with the examination[s] that generally found some low back range of motion limitations and episodes of tenderness, but no sensory, strength or reflex deficits." (R. 607).

---

[25] The Court notes that Plaintiff's last documented visit to a pain clinic appears to have been on April 28, 2010 with Dr. John Minor, D.O., at the Spine & Pain Clinic. (R. 372–74).

The ALJ also identified inconsistencies between the record and Plaintiff's testimony about her mental impairments. The ALJ noted that Plaintiff "did not commence mental health treatment until 2011, approximately three years after the alleged onset date." (R. 606). The ALJ stated that, while "the record shows two psychiatric hospitalizations over a 9 year period since the alleged onset date," the incidents were "short-term" and that Plaintiff "return[ed] to a stable base line quickly." (R. 605). Plaintiff's progress notes indicated that Plaintiff "report[ed] a good response to psychotropic medications." (R. 605). The ALJ further noted that Plaintiff's "PHQ-2 depression screening scores have been zero, which is indicative of no symptoms." (R. 605). Although she "minimized her activities of daily living," the ALJ stated that Plaintiff also "reported cooking several times a week, doing cleaning, shopping[,] and laundry weekly," "caring for her personal needs without assistance," "taking public transportation," "getting along well with family and friends," and "caring for her boyfriend's mother." (R. 607–08). The ALJ also noted that Plaintiff visited Florida in early 2014 and spent three months there in early 2015, "which suggests that [Plaintiff] could travel long distances despite her mental and physical complaints, could interact with others despite her dislike of crowds, is not homebound, can make plans, exercise judgment, is able to function in unknown contexts and was motivated." (R. 608).

Accordingly, the ALJ found that, despite Plaintiff's physical and mental limitations, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b),[26] "except that [she] cannot climb ropes, ladders[,] or scaffolds; should avoid

---

[26] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

working with unprotected heights; can perform a low stress job defined as only occasional decision making[,] changes in work setting[,] judgment required[,] and only occasional interaction with co-workers, supervisors and the general public." (R. 604). The ALJ stated that, in making these findings, he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (R. 604). The ALJ also stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927." (R. 604).

### 2.    Steps Four and Five

At step four, relying on the VE's testimony, the ALJ found that Plaintiff was unable to perform any of her past relevant work as a "packager, hand . . . and inspector." (R. 612). At step five, again relying on the VE's testimony, the ALJ found that, "considering [Plaintiff's] age, education, work experience, and [RFC]," Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."[27] (R. 613). Accordingly, the ALJ concluded that a "finding of 'not disabled' is . . . appropriate." (R. 613).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been

---

[27] Specifically, the ALJ noted the VE's testimony that an individual of Plaintiff's age, education, work experience, and RFC would be able to perform "the requirements of representative occupations such as office helper . . . ; mail clerk . . . ; and marker II." (R. 613).

applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court can reject the facts that the ALJ found "'only if a reasonable factfinder would *have to conclude otherwise*.'" *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.    Analysis

Plaintiff argues that the Commissioner erred in several ways in denying her claim, specifically that: (i) the ALJ erroneously discounted the opinion evidence of Plaintiff's treating physician, Dr. Marra, and treating psychiatric nurse practitioner, NP Redmond; (ii) the ALJ's determination of Plaintiff's RFC for light work is not supported by substantial evidence; and (iii) the ALJ's step five determination that Plaintiff was capable of work as an office helper, mail clerk, or marker II is not supported by substantial evidence. (Dkt. No. 13, at 14–25).

### 1.    Dr. Marra's Opinion

Plaintiff argues that "the ALJ has not provided sufficient reason for not affording Dr. Marra's opinion controlling weight." (Dkt. No. 13, at 19). The Commissioner responds that affording Dr. Marra's opinion "little weight" was proper because "it was inconsistent with Dr. Marra's own treatment notes and the totality of the record." (Dkt. No. 16, at 15).

According to the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). In other words, the treating

physician's opinion is not afforded controlling weight where it is inconsistent with other substantial evidence in the record, including opinions from other medical experts. *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). When the ALJ opts not to give a treating physician's opinion controlling weight, he must provide "good reasons" for doing so. *Id.* at 129 (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). "In order to override the opinion of a treating physician, . . . the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see also* 20 C.F.R. § 404.1527(c).

ALJ Fein gave "little weight" to Dr. Marra's "highly restrictive assessment" of Plaintiff's RFC. (R. 609–10). In doing so, the ALJ expressly considered each of the factors described above as outlined in *Selian v. Astrue*, 708 F.3d at 418. First, the ALJ noted that Dr. Marra "first saw [Plaintiff] in April 2017" and had only treated Plaintiff for approximately six months at the time of her second hearing, but "nevertheless indicates that his opinion applies back to 2008, without providing an explanation in his checkbox report to support his finding." (R. 609). While Dr. Marra indicated that his conclusion was based on "inspection of medical records," (R. 1676), that does not undermine the ALJ's conclusions about the relatively limited duration of Dr. Marra's treatment relationship with Plaintiff.

Second, the ALJ considered the amount of medical evidence that supported Dr. Marra's opinion. (R. 609). Specifically, the ALJ pointed to Plaintiff's "benign findings" on examination by Dr. Marra, during which she showed lower back tenderness but "presented in no acute distress"; "was not depressed, not anxious[,] and not irritable"; had normal sensory and reflex

responses; and "had a PHQ-2 score of zero, with the doctor performing only a cursory physical examination without any testing of the lower extremities and no examination of the low back area."[28] (R. 609). Accordingly, the ALJ concluded that Dr. Marra's examinations of Plaintiff were inconsistent with his "highly restrictive assessment" and did not support his opinion that Plaintiff was "able to sit/stand for only very short periods at a time," could not "lift *any* weight," and was limited in her ability to look down. (R. 609–10). *See Kelsey v. Comm'r of Soc. Sec.*, 335 F.Supp.3d 437, 443 (W.D.N.Y. 2018) ("It is an appropriate exercise of discretion for an ALJ to afford little weight to a medical opinion that is internally inconsistent.").

Third, the ALJ considered the other medical evidence of Plaintiff's physical impairments and appropriately found that Dr. Marra's opinion was "not consistent with the . . . evidence from other care providers and evaluators showing generally only some range of motion limitations of the lumbar spine and tenderness of the low back area, but with no sensory, reflex or strength limitations."[29] (R. 610). The ALJ noted that Dr. Marra's opinion that Plaintiff would be off task more than 20% of a given workday and absent more than four days per month was unsupported by "Dr. Marra's own examinations or those of any other provider or evaluator." (R. 610). The record shows that, on examination, Plaintiff frequently presented as "alert" and "in no acute distress," with adequate social and language skills, intact attention and memory skills, logical and coherent thinking, and without signs of "lethargy, sedation, [or] difficulty focusing." (R. 610 (citing opinions and observations of Drs. Shankman, Ganesh, Popuri, Minor, Shapiro, Lorensen,

---

[28] Plaintiff argues that "it is readily apparent that there is a page missing" from the record of Plaintiff's July 19, 2017 visit with Dr. Marra. (Dkt. No. 13, at 19). The Court, however, cannot find any indication that the four-page document is incomplete. (*See* R. 1593).

[29] Plaintiff also argues that the ALJ's citation to the opinion of a state agency physician was improper, because the documents provide "no evidence of authorship" or were "filled out by a single decision maker" and are "thus not . . . source[s] to which any weight can be afforded." (Dkt. No. 13, at 17). Although the state agency physician's opinion was afforded "great weight" by the ALJ, it is cited only in passing to further demonstrate consensus with and among the opinions of Drs. Ortega, Shankman, Ganesh, Lorensen, and Figueroa. (R. 610).

Santoro, Figueroa, Ortega, Marra, Azar, and Alexander)). As the ALJ concluded, those examinations generally do not support Dr. Marra's opinion as to Plaintiff's ability to stay on task. The ALJ also accurately noted that there was "little evidence showing frequent exacerbations of [Plaintiff's] back or hip discomfort such that 4+ days of absences would result." (R. 610). Accordingly, the ALJ's determination that Dr. Marra's opinion was inconsistent with the record as a whole is supported by substantial evidence. *See Losquadro v. Astrue*, No. 11-cv-1798, 2012 WL 4342069, at *15, 2012 U.S. Dist. LEXIS 135703, at *40 (E.D.N.Y. Sept. 21, 2012) ("The ALJ has discretion in determining the amount of weight to give to various medical opinions and can determine to afford little weight to an opinion if it is inconsistent with the record as a whole.").

Fourth, the ALJ expressly noted that Dr. Marra's opinion was contrary to the assessment of Dr. Azar, "an orthopedic specialist[] who ha[d] been treating [Plaintiff] for several years," and was therefore entitled to a lesser weight. (R. 610). Accordingly, because the ALJ considered that Dr. Marra's treatment of Plaintiff was limited, that there was little evidence supporting his opinion and substantial evidence to the contrary, and that his opinion was not that of a specialist, the Court concludes that the ALJ properly applied the treating physician rule and that substantial evidence in the record supports his assignment of "little weight" Dr. Marra's opinion.

### 2. Psychiatric Nurse Practitioner Redmond's Opinion

Plaintiff argues that, because ALJ Fein "afforded 'little weight' to the opinion of treating Psychiatric Nurse Practitioner Redmond" without substantial evidence, "the ALJ assessed an RFC which inadequately accounts for the severity of Plaintiff's mental limitations." (Dkt. No. 13, at 19). The Commissioner responds that, as a nurse practitioner, NP Redmond's opinion is not entitled to controlling weight under the regulations and, in any event, "the ALJ gave good reasons for assigning [her] opinion little weight." (Dkt. No. 16, at 20).

45

Under 20 C.F.R. § 416.927, an ALJ is required to weigh and evaluate "every medical opinion." Controlling weight may be given to a "treating source's medical opinion on the issue(s) of the nature and severity" of a claimant's impairments if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. A "treating source" is a claimant's "own acceptable medical source who provides . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with a claimant. *Id.* § 416.927(a)(2). Under the Social Security Ruling ("SSR") 06-03p, the regulation applicable to Plaintiff's claim, "nurse practitioners are not considered 'acceptable medical sources,' and their opinions are therefore not 'entitled to any particular weight.'" *Wynn v. Comm'r of Soc. Sec.*, 342 F. Supp. 3d 340, 345 (W.D.N.Y. 2018) (quoting *Wider v. Colvin*, 245 F. Supp. 3d 381, 389 (E.D.N.Y. 2017)).[30] "Nevertheless, an ALJ should consider evidence from 'other sources,' such as nurse practitioners, on important issues like the severity of an impairment and any related functional effects." *Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 432 (W.D.N.Y. 2018).

Here, ALJ Fein accorded little weight to NP Redmond's opinion that Plaintiff: cannot meet competitive standards for completing a workday without interruptions from psychologically based symptoms or performing at a consistent pace; would be off task at work more than 20% of the time; and would be absent from work more than four days each month. (R. 611). In doing so, the ALJ noted NP Redmond "applied her assessment back to June 2008," even though she had

---

[30] The Court notes that the Social Security Administration ("SSA") has rescinded SSR 06-03p, which is now inapplicable to claims filed on or after March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263-01 (Mar. 27, 2017); *see also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (stating that the SSA will recognize Advance Practice Registered Nurses, including nurse practitioners, as acceptable medical sources). "Because plaintiff's claim was filed before that date, the new regulations do not apply here." *Davila v. Comm'r of Soc. Sec.*, No. 16-cv-4774, 2018 WL 5017748, at *7 n.6, 2018 U.S. Dist. LEXIS 177986, at *17 n.6 (E.D.N.Y. Oct. 16, 2018).

only started treating Plaintiff in 2016 and Plaintiff's mental health treatment records began in 2011. (R. 611). Although the Court agrees with Plaintiff that she should not be "fault[ed] . . . for failing to pursue mental health treatment," (Dkt. No. 13, at 20 (quoting *Petersen v. Astrue*, 2 F. Supp. 3d 223, 236 (N.D.N.Y. 2012)), the ALJ cited the relatively short duration of their treatment relationship and the absence of substantial evidence, not as proof that Plaintiff did not suffer from mental impairments, but to weigh the reliability of NP Redmond's opinion as it relates back to 2008.[31]

Furthermore, the ALJ accurately noted that NP Redmond's assessment was inconsistent with the record as a whole, as "mental health progress notes . . . show the claimant is generally stable and responded well to medication." (R. 611). The records cited by the ALJ indicate that, from the beginning of Plaintiff's mental health treatment history in 2011, her mental health providers consistently indicated that Plaintiff was generally stable in mood, coherent, alert, and well oriented and had good insight and judgment. (*See, e.g.*, R. 420–21, 426, 494–96, 499, 981–83). The ALJ noted that, although she was briefly hospitalized following overdose attempts in 2011 and 2015, Plaintiff "returned to her stable baseline quickly," (R. 611), and the record indicates that she has consistently denied experiencing any suicidal ideation. NP Redmond's own treatment notes repeatedly indicate that Plaintiff was alert and oriented and that she regularly reported that she was doing well. (R. 1199, 1202, 1214, 1266–68). And, as the ALJ noted, there are "no observations in [Plaintiff's] mental health progress notes" that indicate "attention deficits, problems with focusing or lethargy[] such that an off task rating of 20% is justified." (R. 611).

---

[31] While not cited by the ALJ, the Court notes that Plaintiff testified at her September 5, 2017 hearing that she first experienced depression in 2011, after the death of her mother. (R. 643)

The ALJ also appropriately found that NP Redmond's opinions were inconsistent with those of the consultative psychiatric examiners. (R. 611). As the ALJ explained, Dr. Alexander opined that Plaintiff was not limited in her ability to "follow and understand simple directions, perform simple tasks independently maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and can appropriately deal with stress." (R. 611 (citing R. 445–48)). The ALJ further cited to the opinion of Dr. Shapiro, who opined that Plaintiff had no limitations following simple instructions, performing simple tasks or complex tasks, maintaining attention and concentration, keeping a schedule, or learning new tasks, but concluded that Plaintiff was limited in relating or interacting with others and dealing with stress. (R. 611–12 (citing (R. 989)). Finally, Dr. Santoro found no limitations in Plaintiff's ability to follow directions, perform simple tasks, maintain attention, learn new tasks, or maintain a schedule. (R. 1223). Dr. Santoro opined that Plaintiff had mild limitations in Plaintiff's ability to perform complex tasks and making appropriate decisions, and moderate limitations in relating to others and dealing with stress. (R. 1223). As the ALJ noted, Drs. Alexander, Shapiro, and Santoro all concluded that Plaintiff's psychiatric symptoms did not "appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (R. 611–12 (citing R. 445–48, 986–90, 1221–24)).

The ALJ thoroughly considered NP Redmond's opinions, and his conclusion that they were entitled to little weight is supported by substantial evidence. Accordingly, the Court finds no error in the ALJ's weighting of NP Redmond's opinion.

### 3.   Plaintiff's RFC

Plaintiff argues that ALJ Fein's conclusion that she is capable of performing light work is not supported by substantial evidence because it "does not comport" with the opinion evidence

of the consultative examiners, State Agency consultants, and Dr. Leong's interrogatory answers. (Dkt. No. 13, at 15–18).

"The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Klimek v. Colvin*, No. 15-cv-00789, 2016 WL 5322022, at *9, 2016 U.S. Dist. LEXIS 129804, at *25 (N.D.N.Y. July 21, 2016), *adopted sub nom. Klimek v. Comm'r of Soc. Sec.*, No. 15-cv-789, 2016 WL 5256753, 2016 U.S. Dist. LEXIS 129491 (N.D.N.Y. Sept. 22, 2016). "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010) (quoting *Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y 1999)). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 CFR §§ 404.1567(b), 416.967(b). It requires a "good deal" of walking or standing, off and on, for a total of approximately six hours in an eight-hour workday, with intermittent sitting occurring during that time. SSR 83-10, 1983 WL 31251, at *5–6, 1983 SSR LEXIS 30, at *13–14 (1983). Alternatively, light work "may involve sitting most of the time with some pushing or pulling of arm or leg controls." *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 66 (2d Cir. 1990). Most jobs considered light work require only occasional, rather than frequent, stooping. SSR 83-10, 1983 WL 31251, at *5–6, 1983 SSR LEXIS 30, at *13–14.

Here, the ALJ found that Plaintiff retained the RFC to perform "low stress," light work that involves "only occasional" decision making, changes in work setting, judgment required, and interaction with co-workers, supervisors, and the general public, except that she cannot "climb ropes, ladders, or scaffolds" and should "avoid working with unprotected heights." (R. 604). In making this finding, the ALJ "considered all symptoms and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence," (R. 604), but nevertheless found that Plaintiff retained the "ability to perform at least sedentary work or work up to the level of light." (R. 611).

As discussed above, substantial evidence supported the ALJ's decision not to fully credit the opinions of Dr. Marra, (*see supra* Section III.B.1–2), which, as the ALJ noted, is the "only . . . physical assessment of record . . . that would support a finding that the claimant can perform significantly less than sedentary work," (R. 611). The remainder of the evidence supports the opinion of Dr. Leong, who concluded that Plaintiff retained the ability to: (i) occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; (ii) sit for six hours and stand and walk for four hours during an eight-hour workday; (iii) continuously balance and stoop; (iv) occasionally kneel, crouch, and use ramps and stairs; and (v) never crawl or work at unprotected heights. (R. 1389–90). As the ALJ noted, this opinion is consistent with the medical evidence showing that Plaintiff "had good responses to the back and hip surgeries," as she "went approximately 4 years without seeing an orthopedist for her back" between 2010 and 2014, reported "resolution of her back pain after the August 2016 back surgery, [and] had a good response to the right hip surgery such that she went almost 12 months without seeing her orthopedic surgeon." (R. 607–08). And, as the ALJ found, the severity of Plaintiff's alleged physical and mental limitations is significantly undermined by other evidence in the record, including physical examinations "generally [finding] some low back range of motion limitation and episodes of tenderness, but no sensory, strength or reflex deficits," (R. 607), psychiatric examinations showing that Plaintiff "has been largely stable . . . over time . . . and that she has responded well to psychotropic medications," (R. 612), and her reported daily living activities. (R. 607). Thus, the ALJ's RFC determination is supported by substantial evidence that "a

reasonable person would find adequate to support" such a finding. *Provost-Harvey v. Comm'r of Soc. Sec.*, No. 06-cv-1128, 2008 WL 697366, at *8, 2008 U.S. Dist. LEXIS 19551, at *14 (N.D.N.Y. Mar. 13, 2008) (citing *Williams ex. Rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

Plaintiff argues primarily that Dr. Leong's conclusions with regard to Plaintiff's limitations and need for a cane are unsupported by evidence in the record. (Dkt. No. 13, at 17). In support of her conclusion, however, Dr. Leong extensively pointed to evidence in the record and summarized each record on which she relied in determining Plaintiff's RFC. (R. 1388–89). For example, Dr. Leong noted that Plaintiff's treatment records following her 2008 back surgery showed she was "doing well" until "onset of significant low back discomfort" in 2009. (R. 1388). She further noted that, by 2011, consultative examiners found that Plaintiff could perform light work with "no gross limitations" for sitting, standing, or walking and moderate limitations for lifting, carrying, pushing, and pulling. (R. 1388). Dr. Leong indicated that, by 2014, a consultative examiner found that Plaintiff's "pain is out of proportion to findings," and that she had "no gross limitations to sitting, standing, walking, and handling small objects," but had "[m]oderate restrictions with bending, lifting, and reaching." (R. 1389). Finally, Dr. Leong cited records showing that Plaintiff was "doing well" after her 2015 hip replacement and 2016 back surgery and reported that her "pain has completely resolved." (R. 1389). Based on these observations, Dr. Leong also opined that Plaintiff's use of a cane "is considered to be temporary" and would not be needed "beyond a 3–6 month period of time" after her 2016 back surgery. (R. 1389). This conclusion is consistent with examinations finding that Plaintiff had "no strength, sensory[,] or reflex deficits of the lower extremities," (R. 608), the observations of Dr. Lorensen and NP Redmond that Plaintiff could walk without a cane, (R. 993, 1276), Plaintiff's hearing

testimony that the cane was not prescribed, (R. 637), and the opinions of Drs. Ganesh, Lorensen, and Figueroa finding mild limitation or no limitation in Plaintiff's ability to stand or walk, (R. 443, 994, 1229). Accordingly, the ALJ's decision to credit Dr. Leong's opinion was based on substantial evidence.

Plaintiff further argues that, contrary to the opinions of Dr. Leong and the consultative examiners to which the ALJ afforded great weight, the ALJ improperly determined that Plaintiff has the RFC for light work with no postural limitations beyond "no ropes, ladders[,] or scaffolds." (Dkt. No. 13, at 16, 18). The Commissioner concedes that the RFC "does not include any restrictions for kneeling, crouching, or climbing stairs," but argues that the omission is harmless because, even including those limitations in the RFC would not change the determination that Plaintiff is capable of light work. (Dkt. No. 16, at 18). As the Commissioner notes, the ALJ specifically questioned the VE about a hypothetical "person of [Plaintiff's] age, education[,] and work experience" who was able "to perform at the light exertional level," except they can "climb ramps or stairs occasionally, kneel and crouch occasionally," and "should not . . . crawl." (R. 650). The VE responded that, even taking these additional postural limitations into account, such an individual could perform work as an office helper, mail clerk, or marker II. (R. 651). The ALJ's hypothetical question and step-five analysis discussing the VE's testimony indicates that the ALJ did account for postural limitations not expressly mentioned in Plaintiff's RFC. Accordingly, to the extent that the ALJ erred in not incorporating Plaintiff's limitation for using ramps, climbing stairs, kneeling, crouching, and crawling into his written decision, that error is harmless because the VE testified that there are jobs of significant numbers in the national economy even accounting for these limitations. *See Burkey v. Colvin*, 284 F. Supp. 3d 420, 424 (W.D.N.Y. 2018) ("Thus, to the extent that the ALJ erred in not incorporating . . .

postural limitations in her written decision, that error is harmless, since the VE testified that there are positions existing in significant numbers in the national economy that can be performed with that limitation.").[32]

Finally, Plaintiff argues that, because the "ALJ found at step three that Plaintiff has 'moderate' limitations in . . . concentration, persistence, and pace," the ALJ erred in failing to account for those limitations in determining Plaintiff's RFC. (Dkt. No. 13, at 21). As noted above, the ALJ determined that Plaintiff had an RFC for "light work" performing "a low stress job" involving "only occasional" decision making, changes in work setting, use of judgment, and interaction with others. (R. 604). Such a finding, however, is "fully consistent with the observation that Plaintiff has moderate limitations in concentration, persistence, and pace." *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 401 (W.D.N.Y. 2018) (holding that an RFC for work requiring "sufficient attention and concentration to understand, remember and follow simple instructions" not inconsistent with step three finding of moderate limitations in concentration, persistence, and pace); *see also Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (affirming ALJ's determination that Plaintiff had "moderate difficulties in concentration, persistence and pace" and an RFC for "simple, routine, low-stress, and unskilled tasks" involving "no more than minimal contact with co-workers, supervisors and the general public."). In any event, there is "no requirement that an ALJ use the same language from step two or three in the RFC analysis, so the absence of the words 'concentration, persistence, or pace' in the ALJ's RFC assessment is not *per se* error." *Peryea v. Comm'r of Soc. Sec.*, No. 13-cv-0173, 2014 WL

---

[32] Plaintiff also argues that, based on the opinions of the consultative examiners, "it would appear that Plaintiff is limited in her ability to lift and carry mass, limited in the bending, and limited in the use of the arms for pushing, pulling, and/or reaching." (Dkt. No. 13, at 16). The Court notes, however, that an RFC for light work, by definition, restricts an individual to "lifting no more than 20 pounds at a time," limits "frequent lifting or carrying" to objects "weighing up to 10 pounds," and requires only "some pushing and pulling of arm-hand or leg-foot controls." SSR 83-10, 1983 WL 31251, at *5–6, 1983 SSR LEXIS 30, at *13–14 (1983).

4105296, at *10, 2014 U.S. Dist. LEXIS 116017, at *22 (N.D.N.Y. July 15, 2014), *report and recommendation adopted*, 2014 WL 4105296, 2014 U.S. Dist. LEXIS 115501 (N.D.N.Y. Aug. 20, 2014); *see also Pidgeon v. Comm'r of Soc. Sec.*, No. 15-cv-6578, 2017 WL 4680412, at *7, 2017 U.S. Dist. LEXIS 172565, at *22 (W.D.N.Y. Oct. 18, 2017) (concluding that, "to the extent Plaintiff contends that the ALJ was required to expressly include the moderate limitations (in concentration, persistence and pace) identified at Step 3 in the RFC determination,4 such argument lacks merit because the ALJ's findings at step 3 of the sequential analysis are not an RFC determination"). Accordingly, remand is not warranted.

### 4.    Step Five Analysis

As described above, the VE testified that someone with Plaintiff's age, experience, education, and RFC was capable of light work as an office helper, mail clerk, or marker II. (R. 650). At step five, the ALJ relied on that testimony to determine whether "jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]." (R. 613). Plaintiff first asserts that her currently-assessed RFC is incompatible with the requirements of work as an office helper,[33] mail clerk,[34] or marker II,[35] because these jobs

---

[33] The DOT defines an office helper as one who:

> Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine.

DICOT 239.567-010, 1991 WL 672232.

[34] The DOT defines a mail clerk as one who:

> Sorts incoming mail for distribution and dispatches outgoing mail: Opens envelopes by hand or machine. Stamps date and time of receipt on incoming mail. Sorts mail according to destination and type, such as returned letters, adjustments, bills, orders, and payments. Readdresses undeliverable mail bearing incomplete or incorrect address. Examines outgoing mail for appearance and seals envelopes by hand or machine. Stamps outgoing mail by hand or with postage meter.

DICOT 209.687-026, 1991 WL 671813.

[35] The DOT defines a marker II as one who:

require "more than occasional decisions, changes in work, and use of judgment." (Dkt. No. 13, at 23–25). However, none of the listings in the *Dictionary of Occupational Titles* indicate that these jobs require the need to make decisions, change work settings, or use judgement, much less do they require doing so "more than occasionally." Furthermore, the ALJ expressly stated that he determined, "[p]ursuant to SSR 00-4p . . . that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. 613). "Consequently, there is no basis for a court to conclude that jobs identified by the vocational expert conflict with [Plaintiff's] residual functional capacity rating or the *Dictionary of Occupational Titles*." *Walker v. Colvin*, No. 12-cv-483, 2013 WL 5434065, at *12, 2013 U.S. Dist. LEXIS 139747, at *32 (N.D.N.Y. June 19, 2013), *report and recommendation adopted*, 2013 WL 5434065, 2013 U.S. Dist. LEXIS 138704 (N.D.N.Y. Sept. 27, 2013).

Plaintiff's remaining arguments—that her assessed RFC should include restrictions on "production paced work" and her "ability to stand/walk"—are simply objections to the RFC as assessed by the ALJ. (Dkt. No. 13, at 24–25). Because the Court has already determined that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence, Plaintiff's arguments fail. *See Snyder v. Colvin*, 667 F. App'x 319, 321 (2d Cir. 2016) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony.").

---

Marks or affixes trademarks or other identifying information, such as size, color, grade, or process code, on merchandise, material, or product, using one or more methods, such as metal punch and hammer, crayon, rubber stamp and ink, electric pencil, branding iron, acid and stencil, sand-grit and stencil, or tags. May inspect items before marking. May attach gummed labels to merchandise, material, or product, using tag dispensing machine. May clean items. May use printing mechanism or labeling press.

DICOT 920.687-126, 1991 WL 687992.

IV.    **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**.

**IT IS SO ORDERED.**

_____
Brenda K. Sannes
U.S. District Judge

Dated: March 26, 2019
        Syracuse, New York